## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MARK D. PFLUEGER, | ) | CASE. NO. 4:06CV3292 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND |
| | ) | ORDER |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Mark D. Pflueger ("Pflueger"), seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("SSA"), denying Pflueger's application for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.* and supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*  After carefully reviewing the record, I conclude the SSA decision should be affirmed.

## PROCEDURAL HISTORY

Pflueger's applications were denied initially and on reconsideration (Tr. 14.) Following an administrative hearing, an Administrative Law Judge (ALJ) issued a decision on January 18, 2006, determining that Pflueger was "not disabled." (Tr. 14-25.) On November 18, 2006, the Appeals Council of the Social Security Administration denied Pflueger's request for review.  (Tr. 5-7.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## FACTUAL HISTORY

Pflueger was born in October 1959 and has a high school education. (Tr. 15.) He possesses past work experience as a construction worker, welder, order filler, and carpenter. (Tr. 15, 63, 110-17, 102, 107.) He filed applications for disability insurance on September 24, 2003, alleging disability since August 6, 2001, due to numbness in his back, three cracked and two crushed vertebrae, severe bruises in the left heel, and colon problems with a colostomy. (Tr. 14-15, 101.)[1]

### Left shoulder

The record indicates that Pflueger saw Dr. Matthew Reckmeyer on January 15, 2001, for an evaluation of left shoulder pain. (Tr. 226.) Pflueger described a generalized discomfort in his shoulder with use, and pain radiating down his arm and into his hand. (Tr. 226.) His right side had not been affected. (Tr. 226.) On examination, Pflueger's left shoulder had no atrophy, but there was tenderness anteriorly over the acromion and some slight soft crepitance. (Tr. 226.) He had limitation with internal rotation to his lower lumbar area. (Tr. 226.) Flexion was painful above 90 degrees, but Dr. Reckmeyer could assist him to about 150 to 160 degrees. (Tr. 226.) Pflueger was neurovascularly intact with radial, medial, and ulnar nerve function normal. (Tr. 227.) An MRI scan demonstrated an area of inflammation in the cuff, and an anterior cyst off of the glenoid consistent with a

---

[1] In addition to the medical impairments listed in his application for benefits, Pflueger's medical records indicate that he also suffered a serve injury to his right index finger resulting in its amputation in 1990 (Tr. 182), the removal of a dorsal ganglion wrist cyst in 1994 (Tr. 180), and a right elbow strain in 1996 (Tr. 247). The figure amputation resulted in a 10% permanent impairment. (Tr. 244) This impairment was considered by the ALJ in her analysis. (Tr. 24.)

2

ganglion.  (Tr. 227.)   The doctor's impression was shoulder pain with likely impingement and ganglion cyst.  (Tr. 227.)

On January 23, 2001, Pflueger underwent subscapular rotator cuff tendon surgery of the left shoulder.  (Tr. 190-191.)  On February 1, 2001, Pflueger saw Dr. Reckmeyer for follow-up and the wound was healing well.  (Tr. 225.)  Pflueger was given a prescription for physical therapy and was instructed to avoid overhead lifting for about three months.  (Tr. 225.)  Dr. Reckmeyer saw Pflueger on April 5, 2001, and noted that he was working his way back into the workforce by working three days per week.  (Tr. 223.)  Pflueger reported some soreness.  (Tr. 223.)  He was not "overdoing it", but was lifting up to 40 pounds.  (Tr. 223.)  Dr. Reckmeyer noted that Pflueger was making appropriate progress in rehabilitation and advised him to continue his program.  (Tr. 223.)

### Left heel

On September 18, 2001, Pflueger saw Dr. Keith Hughes, and reported that he injured his left heel on August 6, 2001, when he fell off a roof and landed on his left heel.  (Tr. 220.)   The left foot revealed point-specific palpation tenderness along the medial plantar aspect of the plantar fascia insertion site into the calcaneus.  (Tr. 221.)  Light touch sensation was intact and motor strength was 5/5.  (Tr. 221.)  X-rays and an MRI scan of the left foot revealed an osteochondral defect in the ankle at the level of the medial talar dome.  (Tr. 221.)   The calcaneus was otherwise intact without significant degenerative changes and mild increased uptake along the medial inferior aspect of the calcaneus at the plantar fascia insertion site.  (Tr. 221.)  Dr. Hughes noted that Pflueger did not seem significantly symptomatic over the area of the osteochondral defect, and recommended an aggressive course of treatment towards plantar fasciitis including stretching, heel cushions,

3

and injections.  (Tr. 221.)  On October 17, 2001, Pflueger reported decreased pain over the last month with regard to his plantar fasciitis/heel contusion.  (Tr. 219.)  He did not wish to proceed with further injections and had returned to regular working duties.  (Tr. 219.)  Pflueger reported pain in the plantar aspect of the heel occasionally while going up and down a ladder.  (Tr. 219.)  Pflueger again declined an injection on December 4, 2001, and reported that he was doing well, but had been having increased pain along the plantar aspect of the heel which was worse in the morning, after arising from prolonged sitting, and after climbing activities such as climbing on ladders with prolonged standing.  (Tr. 218.)  On examination, ankle and subtalar motion were well-preserved.  (Tr. 218.)

Pflueger returned to see Dr. Hughes on January 25, 2002, for a follow-up of his left heel pain, and reported that he was doing quite well.  (Tr. 217.)  Pflueger also reported increased pain in the heel area along the plantar fascia region, but said the previous injection significantly improved his overall symptomatology.  (Tr. 217.)  Dr. Hughes administered an injection to the plantar fascia on the left (Tr. 217.)

On March 18, 2003, Dr. Scott McMullen administered Ossatron extracorporeal shock wave therapy to the left heel for ongoing problems with chronic plantar medial left heel pain consistent with plantar fasciitis.  (Tr. 398.)  The doctor noted that Pflueger previously underwent shock wave therapy several months ago and had approximately 50 percent improvement of his pain.  (Tr. 398.)

**Back pain**

Pflueger  saw Dr. Richard Thompson on January 25, 2002, and complained of experiencing back pain since the time he was hit with a hammer between the scapulae

several months prior.[2]  (Tr. 303.)  He denied any numbness or tingling in his hands, and had not taken anything for it.  (Tr. 303.)  On examination, Pflueger had a significant amount of spinal tenderness in the mid-thoracic area, but did not have paraspinous muscle tenderness or tightness.  (Tr. 303.)  He also had good range of motion, good deep tendon reflexes in the upper extremities, and good muscle strength.  (Tr. 303.)

An MRI of Pflueger's thoracic spine taken on January 28, 2002, did not clearly indicate superficial soft tissue prominence or abnormality related to the reported trauma of being hit with hammer.  (Tr. 302.)  There was some mild degenerative disease in the mid-thoracic spine including some central spurring with mild protrusion, which was felt to be of unknown age and not producing any cord compression, and some old anterior wedging of T11 and T12.  (Tr. 302.)

Dr. Vande Guchte examined Pflueger on March 27, 2002, on referral from Dr. Thompson.  (Tr. 211-15.)  He presented with a small herniated nucleus pulposus of the thoracic spine at T7-8 and T8-9, and thoracic spine pain.  (Tr. 215.)  On examination, Pflueger's gait and station were normal.  (Tr. 213.)  Motor examination revealed full and symmetrical muscle strength, size, and tone throughout the upper and lower extremities.  (Tr. 213.)  Dr. Vande Guchte recommended that Pflueger return to modified work status with no maximum lifting over 20 pounds, no reaching or lifting above shoulder level with both arms, and no twisting.  (Tr. 215.)  The doctor recommended non-operative treatment modalities.  (Tr. 214-15.)

_____

[2] Pflueger had also seen Dr. Thompson on May 17, 2001, complaining of thoracic back pain after lifting shingles at work.  (Tr. 307.)  The doctor diagnosed this as an upper back strain and prescribed skelaxin and darvocet.  Pflueger does not allege that this incident is related to his current disability status.

5

On May 15, 2002, Dr. Vande Guchte saw Pflueger for a follow-up examination regarding upper back pain.  (Tr. 207.)  Pflueger's work status was "unable to work."  (Tr. 208.)  The doctor noted that Pflueger was tender throughout the thoracic region especially in the mid-thoracic area.  (Tr. 208.)  Dr. Vande Guchte stated that he could not clearly identify a musculoskeletal cause of pain and it very likely appeared to be more of a muscular nature, but he could not rule out the possibility of cervical pathology.  (Tr. 208.)  He did not want to utilize exploratory surgery because pain caused by deterioration of thoracic discs in the mid-thoracic area tended to improve or resolve in the majority of cases.  (Tr. 209.)

An MRI of the cervical spine taken on May 16, 2002, showed a congenitally small canal from C3-4 to C6 with hypertrophied ligamenta flava at C6 resulting in mild posterior thecal sac effacement with no definite cord effacement identified; mild cervical spondylosis from C3 to C6 with degenerative disc disease noted at C4-5 and C5-6; slight restrolisthesis of C5 on C6; minor disc bulges at C3-4 and C6-7 without significant disc herniation or neural compromise; and spondylotic neural foraminal narrowing, mild to moderate and bilateral at C5-6 and mild on the right at C6-7.  (Tr. 205.)

In a medical report dated June 4, 2002, Dr. LaClair noted that he saw Pflueger on May 21, 2002, at which time he refused any therapeutic injections.  (T. 95.)  Pflueger used a TENS unit and took Darvocet and Ibuprofen as needed.  (Tr. 95.)  He was not working and denied any change in his symptoms since his last appointment.  (Tr. 95.)  Dr. LeClair noted that Pflueger continued to exhibit a lot of overt behaviors, and there was nothing objective on examination neurologically.  (Tr. 95.)

Dr. LeClair's impression was complaints of upper back pain, apparently in the setting of negative thoracic MRI and symptom embellishment.  (Tr. 95.)  He recommended a functional capacity evaluation, a maximum medical improvement rating, and continuation of ibuprofen and darvocet.  (Tr. 95.)

**Colostomy**

Medical records from Bryan LGH Medical Center indicate that Pflueger was admitted with abdominal pain on June 2, 2003.  (Tr. 330, 332.) He was perceived to have an acute abdomen with most likely perforated diverticular disease.  (Tr. 330.) On admission, an exploratory laparotomy was performed which revealed acute perforated diverticular disease with intra-abdominal abscess, and a sigmoid colon resection, end colostomy and Hartman procedure, as well as takedown of splenic flexure were performed. (Tr. 330, 337.)  Pflueger's post-operative course was essentially unremarkable.  (Tr. 330.)

A CT scan showed no evidence of abscess and only post-operative changes.  (Tr. 330, 342.)  Pflueger was deemed ready for discharge to home on June 11, 2003, in stable condition and with a regular diet.  (Tr. 330.)  He was instructed to do no "heavy lifting" for one month.  (Tr. 330.)   A progress note from Dr. Timothy Cole dated July 2, 2003, indicated that Pflueger's wound was healing well and the pain had completely subsided. (Tr. 3 66.) A report dated September 3, 2003, showed that Pflueger was scheduled to undergo laparoscopic colostomy takedown in October 2003.  (Tr. 361-63.)

**Functional Capacity Evaluations**

A Functional Capacity Evaluation Summary Report from Therapy Plus noted that Pflueger was tested on August 6 and 7, 2003, and had inconsistent performance indicating partially non-reliable data.  (Tr. 402.)  Dineen Vlasnik, OTF noted that Pflueger reported

7

pain in the cervical and lumbar area with any twisting or rotation, but twisted at the trunk to set the load on his right rather than turning his feet during horizontal lifts. (Tr. 402.) He limped and lost his balance during most of the carrying and lifting activities, but lost his balance only three times on the balance test. (Tr. 402.) Pflueger was able to carry more weight in a 50-foot front carry than he was able to manage in a four-foot horizontal lift. (Tr. 402.) He demonstrated minimal accessory muscle recruitment during the lifts and carries, demonstrated good trunk control, and the loss of balance and overt pain complaints were the main limiting factors. (Tr. 402.) Pflueger's perceived abilities as measured on the Spinal Function Sort were below those identified objectively in the functional capacities evaluation. (Tr. 402.) This indicated that Pflueger's perception of his abilities was less than those he was actually able to do safely. (Tr. 402.) Pflueger demonstrated cooperative behavior and stated that he was doing his best, but self-limiting behaviors were seen in 11 of the 29 activities. (Tr. 402.) Therefore, the test results did not indicate consistent maximal abilities, but rather the level of effort Pflueger was willing to provide. (Tr. 402.)

Ms. Vlasnik reported that Pflueger demonstrated good trunk control/safety for lifts, but limping caused poor control of loads and decreased smoothness. (Tr. 403.) Pflueger's quality of movement was affected by decreased left heel strike, causing unsteady gait with carries and lifts. (Tr. 403.) Pflueger demonstrated excellent flexibility for kneeling, crouching, and repetitive squatting, as well as static sitting. (Tr. 403.) There was good tolerance for walking, stair climbing, and ladder use, although Pflueger made verbal complaints of pain. (Tr. 403.) He also tested in the average range for bilateral hand coordination activities. (Tr. 403.) Due to clinical inconsistencies, objective measurement

8

of actual limitations with regard to lifting, carrying, elevated work, forward bending, rotational standing, standing, and crawling could not be assessed. (Tr. 403.) Grip strength was below the tenth percentile for someone in Pflueger's age group. (Tr. 403.) Ms. Vlasnik reported that Pflueger scored in the light work category. (Tr. 403.)

On August 20, 2003, Pflueger was evaluated by Dr. Denise Vosick in connection with his Workers' Compensation claim. (Tr. 20, 354.) She noted that surveillance video from a private investigator from May and July 2002, and January and February 2003, showed that Pflueger appeared to be involved in his community, running errands, attending church, and visiting private residences. (Tr. 356.) He was also observed driving at very high speeds on gravel roads frequently, retrieving mail from his mailbox and raising an envelope overhead without difficulty, walking without a limp on several occasions, and carrying an 18-pack of beer from the store to his truck and placing it in the truck bed without difficulty. (Tr. 356.) Dr. Vosick noted that Pflueger ambulated to the clinic independently, arose from his chair, and bent over to pick up a magazine for an elderly person who had dropped it. (Tr. 356.) On examination, transitional movements appeared quite difficult. (Tr. 356.) He was slow to arise from his chair, pushing on the chair arms or his thighs to assume a standing position. (Tr. 357.) Neck motion was deceased in all planes due to increased thoracic back pain. (Tr. 357.) There was no cervical spinous process tenderness. (Tr. 357.) Active range of motion of the shoulders was limited due to pain. (Tr. 357.) Provocative signs for intrinsic shoulder pathology were negative, and drop arm test was negative bilaterally. (Tr. 357.) Pflueger's back showed exquisite hypersensitivity diffusely in the thoracic spinal region, and he started crying. (Tr. 357.) Thoracolumbar range of motion was self-limited due to pain. (Tr. 357.) There was no back

9

or leg pain with seated straight leg raise, but there was upper mid-back pain with supine straight leg raise.  (Tr. 357.)  No neural impingement signs were elicited.  (Tr. 357.) Strength was at least 4+/5 throughout.  (Tr. 357.)

Dr. Vosick's impressions were chronic upper back pain without neurological deficits; symptoms magnification with 4/5 positive Waddell's signs, positive simulation test, positive distraction test, and generalized overreaction; inconsistent performance on recent functional capacity evaluation; and surveillance data showing greater functional abilities and less pain behavior than demonstrated on examination.  (Tr. 357-58.)  Dr. Vosick noted that Pflueger had no neurological deficits, and no impairment of the whole person for his upper back condition.  (Tr. 358.)  Additionally, noted that Pflueger's functional capacity evaluation placed him in the light work category, but was fraught with inconsistent performance.  (Tr. 358.) This could reflect perceived functional limitations and specific work restrictions were difficult to produce in this case.  (Tr. 358-59.)

Even so, Dr. Vosick stated that she doubted Pflueger would tolerate anything more strenuous than light duty work and he could benefit from vocational rehabilitation.  (Tr. 359.)  Chiropractor Jeff K. Johnson examined Pflueger on January 6, 2004, at the request of Pflueger's attorney.  (Tr. 408.)  Pflueger's chief complaint was sharp pain in the middle back region with secondary pain in the lower back region which varied from day-to-day, but rated a six to seven on a ten point scale.  (Tr. 408.)  He also complained of chronic left heel pain which made him limp.  (Tr. 408.)  Pflueger reported that walking, standing, and lifting made his pain worse, and darvocet and other pain pills reduced his pain temporarily.  (Tr. 408.)  Pflueger used a TENS unit at home for pain relief.  (Tr. 408.)  Mr. Johnson diagnosed chronic myofascial pain of the thoracic spine complicated by hyper-facilitation

10

of the nerves, and plantar fasciitis resulting from a contusion of the heel pad.  (Tr. 409.)
He advised not lifting greater than 10 to 15 pounds repetitively, and stated that a light work
category would be descriptive of Pflueger's safe and permanent working conditions.  (Tr.
410.)  Mr. Johnson also reviewed the surveillance video viewed by Dr. Vosick, noting that
the activities appeared inconsistent with his examination findings.  (Tr. 410.)  Mr. Johnson
offered his opinion that Pflueger would have had increased mobility and less pain if he had
been taking pain medication, and these activities performed one time and not repetitively.
(Tr. 410.)  Mr. Johnson stated that he did not see any forward flexion or extension of the
thoracic or thoracolumbar regions on the video, which were the most limited on
examination.  (Tr. 410.)

On January 20, 2004, Pflueger saw Dr. Scott McPherson for a consultative disability
evaluation.  (Tr. 375.)  Pflueger was unable to sit still due to pain, and moved frequently.
(Tr. 377.)   He teared-up occasionally during examination, and walked with a significant
limp favoring his left foot.  (Tr. 377.)  Pflueger had exclusive tenderness "just to light touch"
over the spine from the lower cervical to the lower lumbar region with no area that was not
sensitive.  (Tr. 378.)  Nevertheless, there was no significant tenderness or trigger point
noted from about one inch lateral to the spine bilaterally.  (Tr. 378.)  There was no leg
edema and his feet appeared normal.  (Tr. 378.)  Pflueger was "exquisitely tender" to "very
light touch" in the left heel.  (Tr. 378.)  Grip strength was powerful bilaterally despite
amputation of the right index finger.  (Tr. 378.)

In a letter dated July 2, 2004, Dr. Vande Guchte stated that he had reviewed
Pflueger's prior medical records at the request of Pflueger's attorney.  (Tr. 411.)  The
objective clinical findings continued to be inconsistent, and Pflueger's subjective symptoms

11

had been treated and reached maximum medical improvement. (Tr. 412-13.) Dr. Vande Guchte did not review Pflueger's functional capacity evaluation but stated that the light category work condition that Pflueger had been placed in by his evaluation should be "easily accommodated by the patient." (Tr. 413.)

## THE ALJ'S DECISION

The ALJ determined that Pflueger had acquired sufficient quarters of coverage to satisfy Title II of the Act. (Tr. 23.) She found that Pflueger had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. 23.) She determined that Pflueger had a combination of impairments considered "severe" based on the requirements in the regulations, 20 C.F.R. §§ 404.1520(c), but that he did not meet or equal the Listings in Appendix 1 to Subpart P of Regulation 4. (Tr. 24.) The ALJ determined that Pflueger's allegations regarding his limitations are not totally credible.

The ALJ found that Pflueger has the residual functional capacity ("RFC") to:

> lift 20 pounds occasionally and 10 pounds frequently; sit 6 hours in an 8-hour workday; stand 6 hours in an 8-hour workday; and walk 6 hours in an 8-hour workday. He is able to drive. The claimant is further restricted to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. He is precluded from climbing ladders, ropes, or scaffolds. Further, the claimant should avoid working overhead with the left arm. The claimant has amputation of the index finger on the right hard, but still has a powerful grip. Because of the right index finger amputation, he can perform occasional fingering with fine manipulation on the right. Finally, the claimant is precluded from twisting.

(Tr. 24.) The ALJ determined that Pflueger's past relevant work as an order filler does not require the performance of work-related activities as precluded by his residual functional capacity. (Tr. 24.) Additionally, Pflueger's medically determinable status post amputation of the right index finger; chronic myofascial pain of the thoracic spine, complicated by

12

hyper-facilitation of the nerves; small disc protrusions at T7/8and T8/9; left foot plantar fasciitis, secondary to contusion of the heel pad; diverticulitis; and status post partial bowel resection do not prevent the claimant from performing his past relevant work. (Tr. 24.) Thus, the ALJ determined that Pflueger was not disabled as defined under the Act.  (Tr. 24.)

**STANDARD OF REVIEW**

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995.)  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirm that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001.)  The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994.)   As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## ANALYSIS

### "Disability" Defined

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A.)  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A.) If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B.)

### Sequential Evaluation and Residual Functional Capacity

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe mental or physical impairment; 3) the impairments, singly or combined, meet the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

14

The ALJ determined that Pflueger had not been gainfully employed since August 6, 2001.  (Tr. 15-16.)   Additionally, the ALJ determined that the medical evidence established Plfueger had a post amputation of the right index finger; chronic myofascial pain of the thoracic spine, complicated by hyper-facilitation of the nerves; small disc protrusions at T7/8 and T8/9; left foot plantar fasciitis; diverticulitus; and post partial bowel resection, that are "severe" within the meaning of the Regulations, but that his impairments do not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 16-18.)

If a claimant has a severe physical or mental impairment that does not meet the listing, the Commissioner will then assess residual functional capacity (RFC).  20 C.F.R. § 404.1520a(d)(3).  Residual functional capacity is defined as what the claimant "can still do despite his or her 'physical or mental limitations.'"  *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004); *quoting* 20 C.F.R. §§ 404.1545(a), 416.945(a.)  Residual functional capacity is an assessment based on all "relevant evidence," including observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations.  *See Pearsall v. Massanari,* 274 F.3d 1211, 1217-18 (8th Cir. 2001); *see* §§ 404.1545(a)-(c), 416.945(a)-(c.)   An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Id.* at 1219.  The Court of Appeals for the Eighth Circuit has stated:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional  capacity is a medical question," *Singh,* 222 F.3d at 451.

15

> "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000)
> (per curiam), must support the determination of the claimant's RFC, and the
> ALJ should obtain medical evidence that addresses the claimant's "ability to
> function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.
> 2000).

*Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001).   "The [social security] regulations

provide that a treating physician's opinion  . . .  will be granted 'controlling weight,' provided

the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] record.'"

*Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. §

404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are

supported by superior medical evidence, or if the treating physician has offered an opinion

inconsistent with other evidence as a whole.  *Id.* at 1013; *Holmstrom,* 270 F.3d at 720.  The

ALJ based her findings on the medical opinions of Pflueger's treating physicians, including

Dr. Hughes (foot), Dr. Vande Guchte (back) and Dr. Cole (colon).   Furthermore, the ALJ

gave Dr. Vande Guchte's opinion controlling weight, finding that it was "well supported by

medically acceptable clinical and laboratory techniques and is not inconsistent with the

other substantial evidence in the case record."  (Tr. 21.)

Additionally, the ALJ must make explicit findings regarding the actual physical and

mental demands of the claimant's past work.  *Pfitzner v. Apfel,* 169 F.3d 566, 569 (8th Cir.

1999.)  The ALJ may discharge this duty by referring to the specific job description in the

United States Dep't of Labor, Employment and Training Admin., Dictionary of Occupational

Titles (DOT) that are associated with the claimant's past work.  *Id.*  "According to the

Secretary's interpretation of past relevant work under 20 C.F.R. § 404.1520(e), [A] claimant

16

will be found to be "not disabled" when it is determined that he or she retains the [residual functional capacity] to perform: 1. The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Evans v. Shalala*, 21 F.3d 832, 833-34 (8th Cir. 1994) *citing* S.S.R. 82-61, 1975-1982 Soc.Sec.Rep. 836, 838 (West 1983). Thus, even if Pflueger cannot perform the actual demands of his past relevant work, if the ALJ finds that he can carry out his job as performed generally within the national economy, he is not disabled under the regulations.

In this case, the ALJ relied on the testimony of the Vocational Expert who testified that the manner in which Pflueger performed his past work as "order filler" was consistent with the way in which it is frequently performed in the national economy. (Tr. 21-22.) The ALJ relied on the VE testimony regarding the explicit functions of the job, finding that the DOT # 922.687-058, unskilled, medium, was the closest classification as the Pflueger's prior work. Despite the fact that Pflueger performed his actual position at medium work, the VE testified that there were other order filler jobs that are light work with lifting up to 20 pounds and that do not require twisting. (Tr. 553.) The VE explained that the DOT doesn't take into account the light work position, but that it would be grouped with the prior position into the same SOC code which transfers into a census code.[3] (Tr. 555-556.) Therefore, the court finds that the ALJ determination, based on the VE's testimony, that Pflueger could perform his past relevant work as an order filler as it is performed in the national economy is support by substantial evidence.

---

[3] The census code pulls numbers out the national economy of jobs that exist with similar tasks, in this case that number is 895. (Tr. 555.)

17

Pflueger next argues that the ALJ provided an incorrect hypothetical to the VE because the ALJ did not properly account for his pain and other limitations. However, it is well-established that a hypothetical question need only include those impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004). Thus, the court looks to see if the ALJ correctly determined Pflueger's impairments and limitations.

Pflueger indicates that his pain is such that he cannot work eight hours a day, five days a week, or its equivalent. He argues that the ALJ incorrectly based her decision regarding his RFC on his ability to perform sporadic light activities, and that this ability does not mean that he is able to perform full-time competitive work. *Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000), citing *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998); *see also*, Social Security Ruling 96-8p (residual functional capacity is an assessment of an individual's ability to perform sustained work-related physical activities in a work setting for eight hours a day, five days a week, or the equivalent work schedule.)

However, there is substantial evidence in the record to support the ALJ finding that Pflueger's subjective pain complaints are not credible. The Eighth Circuit Court of Appeals recently summarized an ALJ's duty with regard to assessing a social security claimant's credibility relative to subjective complaints, including pain:

> A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. § § 404.1529, 416.929; *McKinney v. Apfel,* 228 F.3d 860, 864 (8th Cir. 2000); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In evaluating subjective complaints, however, the ALJ must consider objective medical evidence, as well as any evidence relating to the so-called *Polaski* factors, namely: (I) a claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) dosage, effectiveness,

18

> and side effects of medication; and (v) functional restrictions.  *Polaski*, 739
> F.2d at 1322.  In rejecting a claimant's complaints of pain as not credible, we
> expect an ALJ to "detail the reasons for discrediting the testimony and set
> forth the inconsistencies found."  *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th
> Cir. 2003).

*Guilliams v. Barnhart*,  393 F.3d 798, 801-802 (8th Cir. 2005).  An ALJ is required to make

an "express credibility determination" when discrediting a social security claimant's

subjective complaints.  *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).  This duty is

fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined

the factors before discounting the claimant's testimony.  An ALJ is "not required to discuss

methodically each *Polaski* consideration."  *Id.* at 972.

The federal regulations provide that the ALJ must consider all symptoms, "including

pain, and the extent to which symptoms can reasonably be accepted as consistent with the

objective medical evidence," defined as "medical signs and laboratory findings." 20 C.F.R.

§ 416.929.  Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be
> observed, apart from your statements (symptoms). Signs must be shown by
> medically acceptable clinical diagnostic techniques. Psychiatric signs are
> medically demonstrable phenomena that indicate specific psychological
> abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory,
> orientation, development, or perception. They must also be shown by
> observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

> "Laboratory findings" are defined as: "anatomical, physiological, or
> psychological phenomena which can be shown by the use of medically
> acceptable laboratory diagnostic techniques. Some of these diagnostic
> techniques include chemical tests, electrophysiological studies
> (electrocardiogram, electroencephalogram, etc.), roentgenological studies
> (X-rays), and psychological tests."

20 C.F.R. § 416.928(c).

19

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.   Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996). [4]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain.  *Dunahoo v.*

_____

[4]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

*Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In this case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Pflueger's subjective pain complaints.[5]  The ALJ summarized in detail Pflueger's medical history, and outlined his subjective complaints of pain.  (Tr. 20-21.)  The ALJ considered Pflueger's daily activities, which include: household chores, such as vacuuming, dusting, dish washing, cooking, caring for his children's needs, and taking his children various places.  (Tr. 20.)  The ALJ gave significant weight to the opinions of Dr. Vande Guchte, Pflueger's treating physician, who determined that based on Pflueger's functional restrictions, he is capable of light work - lifting no more than 20 pounds, no reaching or lifting above the shoulder with both arms, and no twisting.  (Tr. 20). The ALJ further noted that Dr. Vande Guchte stated to Pflueger that he was unable to clearly identify a musculoskeletal cause of Pflueger's pain, and that it appears to be more of a muscular nature.  (Tr. 20.)  Additionally, the ALJ noted that self-limiting behaviors were seen in 11 of the 29 activities in the August 6-7, 2003 Functional Capacity Evaluation. Further, Dr. Vosick, who evaluated Pflueger in conjunction with his workers' compensation claim, found no significant objective clinical findings and diffuse hypersensitivity to touch, but did find Pflueger was limited to light work.

---

[5] While the ALJ does not directly cite *Polaski* in her decision, she clearly applies its requirements and the requirements of the §§ 404.1529 and 416.929 and the applicable regulations.

21

In summary, the ALJ thoroughly considered Pflueger's subjective pain complaints, the reports of his physicians, the reports of consulting physicians, and Pflueger's own statements. The ALJ correctly engaged in the *Polaski* analysis, set out the standards stated in §§ 404.1529 and 416.929, and the applicable regulations. (Tr. 19.) The ALJ's conclusion that Pflueger's pain is not severe enough to prevent him from engaging in his past relevant work as an order filler was well-founded, and followed an appropriate express credibility determination regarding Pflueger's assertion of subjective complaints.

Therefore, the ALJ appropriately determined that Pflueger's testimony was not credible with respect to the extent of his symptoms and limitations. The Court finds the ALJ's express credibility determination is substantially supported by the record as a whole.

Additionally, Pflueger argues that the hypothetical was incorrect because the ALJ should have determined that he cannot reach or lift above the shoulder with both arms and because there was no substantial evidence to support the ALJ's determination regarding the amount of time that he can stand or walk. The ALJ posed the relevant portion of the hypothetical as, "Sit, stand and walk six out of eight. That's six hours out of eight hours. . . . And he needs to – let's see here – avoid working overhead with the left arm." (Tr. 551.) The medical records provide that in 2002, Dr. Vande Guchte did indicate that Pflueger should not reach or lift over the shoulder with both arms. (Tr. 215.) However, the testimony of the VE indicates that the order filler position does not require any lifting or reaching over the shoulder level. Thus, even if the ALJ should have provided Dr. Vande Guchte's complete limitations, the error was harmless.

Additionally, the court finds that there is substantial evidence in the record to support the ALJ's findings regarding Pflueger's ability to stand and walk for six out of eight hours.

22

Dr. Vande Guchte placed no restrictions on Pflueger's ability to stand and walk. Additionally, Dr. Hughes's only limitation placed on Pflueger for his plantar fasciitis was to remain off of ladder climbing duties at work.  (Tr. 218.)  Thus, the findings of the consultative physicians regarding his ability to stand and walk are completely consistent with his treating physicians and provide substantial evidence to support the ALJ's findings.

## CONCLUSION

For the reasons stated in this memorandum, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.


DATED this 14th day of January, 2008.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge

23